May it please the Court, Sandy Speck out of the Roberts Dillard Fund in San Francisco for Appellant National Elevator Industry Pension Fund. The pension fund seeks reversal of the District Court's order of dismissal. I'd like to begin by pointing out that this case differs from the usual Private Securities Act case because we obtained three SEC depositions, two of the defendants, Zwarnstein and Bergeron, the CEO and the CFO, and also the controller of the company from the SEC on Freedom of Information Act requests. And those depositions contain emails and exhibits of the defendants' own email communications. Rarely do you see that in a securities complaint. We don't get anything of that nature until after discovery. What these exhibits show and what the complaint shows is undisputed material falsity in the case. That is to say, for three straight quarters, the books were cooked. Falsity is not an issue. There were two million dollars in market losses. Loss causation is not an issue. The only issue in the case is scienter. And our submission this morning is twofold. First, that the complaint pleads enough facts to support intentional fraud, but the Court need not go that far because deliberate recklessness is shown on this record. Judge Patel is an excellent judge, and I've known her a long time, but I think that some of her rulings in this case cannot withstand analysis. She said with respect to deliberate recklessness, the failure of the defendants to question and to question the adjustments that were made in the books and records, and even willful disregard does not constitute deliberate recklessness. Well, for 47 years, willful disregard, in my understanding, is recklessness. So, as a matter of law, that's incorrect. But more importantly, the facts show deliberate recklessness. And there are at least eight component facts that we discussed in the briefs, but let me highlight a few of those. First of all, it was company policy to verify the facts. The Comptroller testified several times in her deposition, Ex Observ Record 455 and 56, 475, 483, 514 and 515, that these adjustments, these plugs of cost of goods sold and inventory would not be made unless fully validated with adequate documentation. Well, the restatement concludes and admits there was never any adequate documentation. The SEC found that they never questioned. They knew of the readjustments, but never questioned them. Well, how could that possibly be? It was so easy to verify it. How can you not easily verify fictitious in-transit inventory? The question comes to mind, what in-transit inventory? I had a question that I figured out by looking at the Internet, but I think it might be helpful if we put it on the table. Mr. — I don't know how to pronounce his name. Mr. Periola? Periolat. Mr. Periolat. Who's the guy who's cooking the books? Well, he's the numbers guy. He's the numbers guy. He's the guy who says there's more inventory, which then plugs the gap. He's in Rocklin. Yes. And the primary facility for inventory is in Lincoln. My understanding is those are maybe 10 miles apart. Is that correct? I don't know that. I don't know that for sure. I think that's right. It's Rocklin's a suburb of Sacramento, as is Lincoln, which suggests to me he's in a position, if there's any question about what's there, it's not very hard for him to go there, talk to the people. I mean, it's not as though the warehouse is in Poughkeepsie. I agree. But, you know, the point about the inventory is important in this case because the inventory was going up three straight quarters. And Defendant Bergeron testified in his deposition that they were obsessed with two things, expanding gross margins, but lowering inventory, lowering inventory. Let me point to that. Prior to the cooking of the books, lowering inventory. Well, I don't know if it's called cooking of the books. That's – I don't know that we make that here, because let me just ask you this about Mr. Perlow. There's some suggestion, and everybody has a different inference, I recognize. But that whether he's incompetent or misunderstands or doesn't is not a very good accountant auditor person is raised here as to whether he's even understanding what he's doing. So I'd appreciate, because that did underlie a lot of what I thought Judge Patel's question. That's right. So I would appreciate your response. Can I finish the question? Sure. Thank you. I have two questions related to Mr. Periolat. For you to respond as to what your allegation is, as to what he understood. But then secondly, is you didn't appeal the dismissal regarding Mr. Periolat, and how might that filter up to these executives? Okay. Periolat is the fall guy for the defendants. He's the guy who provided the numbers. But if you look at this record, the numbers he provided were the numbers that CFO gave him in the first place, because Periolat wasn't solving the problem for a week. So defendants weren't seeing the CFO admitted in this record that he, he, on the back of an envelope, came up with $10.784 million. That's in the record. And let me give you the, the, at 635 of the excerpts of record, he said that he supplied the numbers. And when asked on the next page, ER 636, he admitted to the SEC attorney who, who suggested that was a funny way of accounting for the CFO to provide the numbers, that's a very fair conclusion. So it's not that Periolat was the, was creating numbers. He was giving back the numbers that the CFO gave him in the first instance. So the CFO gave him the numbers, the, the numbers come back exactly what the CFO needed to make the gross margin forecast. And does the CFO seek documentation for those numbers? No, he said, wonderful, we've got the numbers. That's not the way you conduct business. The controller testified you're supposed to validate the numbers. And we know from this record, from the restatement, that they never validated the numbers. And it's so easy to validate these numbers. Judge Patel thought these were not obvious mistakes. How can fictitious entrance in inventory not be obvious? How can fake intercompany profit not be obvious? Double counting, double counting overhead, which they admit, these are all easy to figure out. The auditors figured it out right away. What was the source? How do we know from the allegations in the complaint what the source of these so-called flash reports are? Because the flash reports coming in give what turns out to be the truth. Correct. And it's those flash reports that tell the big guys, hey, we've got problems, which then prompt them to go to Periolat and say, could you fix it? So what's going into those flash reports? The flash reports contain the numbers of cost of goods sold, inventory, gross margin, earnings per share. All of those numbers are coming down below forecast. I understand that. I'm trying to figure out how they're compiled. By the various regions. There's testimony from Comptroller Merkel that each month there are meetings in which each of the controllers for the various divisions comes and makes a 30 to 60 minute presentation at which they're questioned by the controller and the CFO about all of these numbers. Would you go back to my second question, and that is Periolat? Periolat's out of the case. We are not relying on Periolat's state of mind for anything about Sientra. We are focused only on Zwornstein and Bergeron's state of mind for the Sientra. That was- Portion of it. So you don't think that we then need to unpack Periolat's situation? Periolat's out of the case. He's just an actor in this play. And his role is secondary once you understand that Zwornstein created the numbers, that Bergeron was pulling his hair out because the inventory numbers were going through the roof. Well, if they're going through the roof- One of your arguments, I mean, your legal argument seems to be that this holistic approach, or at least Judge Patel's holistic approach was not an appropriate approach to the whole thing. And so my question is, in light of matrix, do you think it's improper to go through the allegations and then do a holistic approach, or how much do, does the district court need to do or say to meet matrix? Well, I think that the way the Third Circuit and the Sixth Circuit have explained this is you take all the facts and lay them on the table, and then you do your analysis of all of those facts by showing how they fit together. Judge Patel didn't do that. She- You know, our Ninth Circuit cases following matrix and- No, the Ninth Circuit cases precede matrix. Some of them. Well, South Ferry is the first one, and it said don't do it that way. South Ferry said collective. Only when Digimart came out and Judge Bybee decided that a dual inquiry would be appropriate, where you look at it one by one- Right, well, that's what I'm saying. There is some tension potentially in how one might go about it. There is tension within the Ninth Circuit cases, but matrix should have closed the door on that tension because the matrix makes it clear it's a purely collective analysis, and the circuits that have followed that, frankly, data cited in our papers, show that it's not to be done one by one because it is isolation analysis to do it one by one, and then at the end, if there was true holistic analysis, it might be different, but there was just a single sentence that said even if you look at this holistically, there's not enough to see answer. That's not analysis. That's a conclusion. You wouldn't accept that from a plaintiff who wrote that in a complaint. You would strike that as conclusory. I'm suggesting to Your Honors, as an appellate court, you should strike that conclusion as conclusory and unacceptable under the telehealth matrix approach. In a sense, this all seems so obvious, that if you're just talking about splitting it up or holistically and so on. I mean, you just do the obvious, which is to say you consider everything in context. So. Yes, you do. But that wasn't done. Well, maybe. We're looking de novo. Look, the judge found five times in this record, between pages ER 46 and 52, that the reason why Bergeron and Zwernstein get off in this case is because they were entitled to rely on Perilak because he'd been accurate in the past. And Judge Patel never cited a single fact, not a single fact, about the fact that after the Lipman inventory, they didn't believe him. They said it was not credible. They said they had never seen inventory that high. They'd never seen margin gaps that high. They were tearing their hair out. None of that is in the order. In fact, I did something I hadn't done in 47 years. I bolded, in the opening brief, every fact that was left out. And I actually have a summary sheet, which I have my time to sell, so. But, Your Honors, these are the facts that were left out. It violates the 10-act prescription that you consider all of the facts. A judge is not entitled to disbelieve all of these facts. Your Honor, my time is way over, and my question is. We'll give you, no, you're over 2.15, but we'll give you some time for rebuttal. And if you want to send a 28-J reply to this, it's fine. Or maybe you already have one. Good morning, Your Honors. My name is Brendan Cullen. May it please the Court, I represent Barofone Systems, Inc., formerly Barofone Holdings, Inc., and Douglas Bergeron. Mr. F and I have just agreed to split our time. I'm going to take seven, he's going to take three. Get to it. I have to watch the clock, which is way down here, which is. Well, I'll help you. So I agreed with everything Mr. Spetkov said until about ten seconds in. I agree this is an unusual case, and it's unusual in a couple of respects. And the SEC complaint is the principal one. The SEC did an entire investigation of these exact circumstances that underlie the complaint. The SEC wrote a complaint that says, Mr. Perrile, where did that, Mr. Perrile's forecasts were always reliable. They relied on it for years. Where did that come from? Judge Patel got that from the SEC complaint, which is in their complaint. They incorporate that complaint, which says there were mistakes made. People thought the forecasts were right. Mr. Perrile said, oh, I fixed the problem. I have determined what the problem is. That's how the SEC described it. And I have made our forecast, which we believed, match our actuals. Great news. Everyone, we've problem solved. That's your story. That's the SEC story. That is the SEC story that is actually their story, because it's incorporated into the pension fund's complaint. This would be a different case if the SEC had done an investigation and decided whatever it decided. You know, the SEC is not always the most vigorous of enforcers, as Judge Rakoff is well aware, and some of the rest of us are, too. So just because the SEC backed off doesn't tell me very much. Well, but the problem is, I might agree with you, if the SEC had done an investigation and said, you know what, nothing to see here, we're going to move on, and the people who were telling the court that that had happened were us. If we'd said, hey, good news, the SEC gave us the all clear, you don't have to believe the plaintiff's complaint anymore. The problem with this case is the SEC complaint is in their complaint. The allegation is that this was all a mistake, that people acted negligently. Actually, Paul Perrile acted negligently. That's the SEC's allegation. That's in their complaint. And you know what? The transcripts that he sent out. I'm less interested in talking about what the SEC said than what's in this complaint. Stated in overall terms, gestalt terms, or maybe in context terms, the story is, holistically, they're missing their numbers. Three quarters in a row, according to the flash reports, the two defendants here have announced publicly that their gross margin is going to be in the high 40s. The numbers that are coming in are in the low 40s. They say this is a catastrophe, and they tell Perrile out to fix it. And he fixes it. And as soon as you get an outside audit comes in, the outside auditor says, wrong. The only thing we need to show that they need to show is, under the complaint, that their story is at least as compelling as the other story. That doesn't mean compelling. It means at least as compelling. So if your story is not very compelling, theirs doesn't need to be either. And it has to show deliberate recklessness. Boy, if you're getting internal reports, three quarters in a row, that say you're missing your numbers. If you're merging with an Israeli company that has low gross margin numbers, much lower than yours, your gross margin numbers have been falling. So even considering your own company, you probably can't meet your targets. The numbers coming in internally on your flash reports are showing you what the pre-merger numbers probably suggested were going to show. And then you say to Perrile out, fix it. To me, that's enough. Well, let me address some of the... Yeah, so tell me why I'm wrong. If I may address... Let me actually first address the question you asked counsel for the pension fund, which was, I thought this inventory was in Lincoln. Why didn't you drive up to Lincoln? You're right. It is a little bit north of Rockland. Yeah, 10 miles or so. It looks like that on Google. I looked it up on Google, too. Yeah. The problem is that the entries that he made were not entries about that inventory at all. The entries that he made were entries about overhead allocated to inventory sitting in overseas factories owned by the Lipman, subsidiaries of the Lipman entity that had just been acquired. Okay. So those aren't obvious to anyone. Nobody could have gone to Lincoln and walked around all day and never seen anything. So that proximity doesn't matter. Similarly, the in-transit inventory. In-transit, by definition, it's on a boat somewhere. It's... Yeah, that part... You couldn't go look at it if you wanted to. The in-transit part I got. Perry Lay knew he was making mistakes, which the SEC says he didn't. And I can give you a bunch of other reasons why we think he didn't, too. Namely, according to their complaint, he didn't make a dime off this scheme that he was engaged in. Didn't trade a single share of stock. He, Perry Lay? Perry Lay didn't make a single dime. It's in their complaint. He allegedly didn't make a single dime. He's not now a defendant, right? Sorry? He's not now a defendant. That's right. But he's the principal wrongdoer. And if he's the principal wrongdoer, he's the guy making these, knowingly making these changes. That's not the allegation that we're dealing with. The people who are charged with being wrongdoers... With respect, Your Honor, he is the one who made changes that he ostensibly knew were incorrect. That is, in fact, their complaint. And if that's true, if that were to be true, one would think, one would suspect that he would be trying to cash in on his wrongdoing, his knowing wrongdoing, which there is no evidence that he did, number one. Well, you know, I'm not sure that in order to sustain the complaint as against the two defendants who are in here, it's necessary to show that Perry Lay knew that they were wrong. What needs to be shown is that the defendants that we have here were reckless in telling him to do that, knowing what they knew. Well, that's right. Somebody needs to know. I agree with that completely. Recklessness is a proxy for knowing, because the actual scientific standard is an intent to deceive, to fraud, to manipulate. So it's a proxy for knowing. It needs to be, it can't just be white heart, empty head. It has to be, you knew, you effectively knew. No, the language is deliberate recklessness is what I'm saying. It's deliberate recklessness. And so somebody has to know that these entries are incorrect, and nobody did. There is not a shred of evidence that anyone knew that the entries that Mr. Perry Lay made were incorrect. Let me ask you on that point, if that were true for the first two quarters, because things were moving along and they didn't have anything, by the third quarter, is it not a different situation in terms of what they knew and also whether there was some obviousness at that point that they have a major hole in their numbers and they, that they went ahead despite that? No. I respectfully know that the record never changes. No one ever comes forward. They have 13 confidential witnesses. Two ways I think this case is different from the other cases, which is what Mr. Spetkoff said. One, they include a complaint that exonerates the defendants in their complaint and say it's proof of fraud. Second, they have 13 confidential witnesses, not a single one of whom says, I knew that those entries were wrong. I knew our inventory was fraudulently inflated. I knew that those gross margins that we were going to predict were inaccurate. Well, I agree with that. I mean, when you see confidential witness, you get kind of excited, or at least I used to when I had antitrust cases. But these confidential witnesses were a little disappointing on the substance, there's no doubt. I thought they did a great job. But the obviousness of this, I mean, you slide along. I guess I'm just still maybe fixated on this.  I'm just going to say, I don't know if by the time you go from second quarter to the third quarter, whether there isn't a change. And you're saying no, because no information changed? No, if I may answer, I see that I'm now eating Mr. Spetkoff's hand. Can I answer your question now? We'll make sure your partner gets enough time. So I think the answer is that the SEC noted this in some of the transcripts that you may have read, that there's a whole sturm und drang about the first quarter change when people are really freaked out that the flash report, which, by the way, where does the flash report come from? It comes from the chaotic and understaffed accounting department that they keep talking about. So why are we going to rely on that flash report from the chaotic and understaffed accounting function when Mr. Paraly's forecasts have been true for years, as an aside? But the answer is, it's less troubling as time goes on because Mr. Paraly fixes this problem. Oh, here we go again, we've got this problem. Mr. Paraly's going to have to go figure out some big thing has changed when we acquired this Israeli company. Some aspect of their business doesn't mesh well with ours. Mr. Paraly figures out what that is, fixes the problem, and his forecasts are still good. So is there anything you would point to anything specific between second and third quarter or at that division point that supports what you're saying? No, I think it's the absence of it that supports what I'm saying. It's the absence of new people saying, wait a second, this doesn't make any sense. We've got these numbers that I think are strange, which you normally would see in a case like this. Normally you'd see a conference witness come forward and say, everyone knew that inventory was ridiculous. Everyone knew those changes that Paul was making were wrong. No one says that at all. And that is, I would submit, powerful evidence that, in fact, no one knew. I've already eaten the tube of Mr. Rath's time. If there's no further questions, I'll sit down. All right. Any further questions? Thank you. Bonnie, would you put three minutes on the clock? Hold on just a second. I should get the clock set. Very good. Good morning. Jordan F. for Barry Zwarnstein. I just want to address a couple of points. I don't have much time. The first point is the way it's been argued this morning and in the briefs and in the district court is that Mr. Zwarnstein said, fix it, and then nothing happened until the audit. That's the allegation. That's the argument, I should say. That's not what the complaint alleges. I'm going to put aside the SEC, forget the SEC. What the complaint alleges, and I want to point to three paragraphs in particular, 264, 265, 266. What those paragraphs allege, our favorite confidential witnesses come forward, particularize, describe a normal, open, thorough process, a normal, open, thorough process. Here's what happened. Mr. Periolet made the entries. How do we know this? Confidential Witness 9 reported to him. Said he made the entries. He kept hard copies. Why? So they could be audited. After that, they were reviewed by internal audit. After that, they were reviewed by accounting personnel, various accounting personnel in San Jose. After that, Confidential Witness 1 said, Laura Merkel, corporate controller, you'd better take a look at this, and she did. That's what it alleges. Paragraph 266 says they had monthly meetings, monthly meetings, not until the annual audit, balance sheet review meetings, financial statement review meetings, open meetings, lots of people. They went over it, Rocklin's numbers, accounting personnel from Rocklin and from San Jose. Paragraph 265 says what? Answers the ultimate question. What caused the erroneous entries? Do any of the confidential witnesses as well have caused it? Has Barry Zwarnstein spoken code to Mr. Periolet, who was too weak to do the right thing? Not one of them. Not one of them says, oh, and I thought it was wrong, too. Not one of them. They say what the problem was. The problem is Verifone and Littman used two different ERP accounting systems. One was using 10.7, one was using 11i, both produced by Oracle, and Verifone was moving itself anyway, transitioning to that system. Big surprise. Changing accounting systems, multinational company causes lots of problems. What do those problems do? They overwhelmed the company. They overwhelmed the company. Precisely what Judge Patel said. Precisely what Zucco said. And precisely on all fours also with Metzler. By the way, a case, despite the fact that it's cited by both of us, the plaintiff's never addressed. The argument this morning is leaving the SEC complaint aside. Yes. What role do you think it properly takes in evaluating the allegations? I think because they put it in, it can be considered holistically. And I'm fine with that because it cuts in our direction. It cuts in our direction because they say that Mr. Periolet... Because we're supposed to look at inferences on both sides? Yes. And Mr. Periolet realized in November that he was mistaken and then told Mr. I don't know if it says Mr. Zwarenstein, Mr. Bergeron. It says told senior management when he realized it was wrong. And that Mr. Zwarenstein and Mr. Bergeron believed, they actually believed that the numbers as reported originally were correct. That goes directly to the center. So I'm fine with considering it and considering it holistically. But I want it to go the old-fashioned way and just go right to the complaint itself. Any further questions? Thank you for your presentation. We'll give you two minutes. Hold on just a second. Let's get it on the clock. Okay. Well, both of my colleagues made wonderful jury arguments. They're not arguments about a complaint's sufficiency. You don't have trial by complaint. I think Judge Fletcher, maybe Judge Thomas, each of you said, look, the credibility of two stories is for a jury to resolve. It's not for the trial court to resolve at the pleading stage. You don't have to know the numbers are wrong. You have to accept them and not verify them. Verifone was created as a conjunction of verification and telephone. The mantra of the company is to verify. Merkle testified, we validate the numbers. They accepted the numbers and never verified them. And the numbers were not Periolat's numbers, remember, 635 of the record. Zwierenstein came up with the number 10.78400 and gave them to Periolat and said, we can't have a gross margin decrease. We need a gross margin increase. That's as compelling an inference of fraud, of deliberate recklessness. We don't have to show intent. We don't have to show actual knowledge. This is not a forecasting case. Three straight quarters? Fool me once, maybe. Fool me twice. Fool me three times? I don't think so. That's fraud. Thank you, Your Honor. Thank you all for your arguments. The case just arguably submitted for decision. And I appreciate your efficiency and presentation.
judges: Thomas, McKeown, Fletcher